First of all, I would like to address the issue that what we're talking about here, in our opinion, is a drug stop, a search for drugs. Secondly, when the agent, Schaeffer, indicates that he would place a call for a K-9 unit, which is set forth on page 40 of the appellant's excerpt, at that point, it would have clearly exceeded the scope of the consent that had been given to Agent Hernandez, who said in a nonchalant manner, do you mind if we take a look inside your vehicle? And thereafter, after the consent was given, a complete search of the vehicle was conducted by Agent Schaeffer and Harrell. Excuse me. All right. MS. MOTT GOTTLIEB Counsel, what level of suspicion is necessary to conduct a search? ATTORNEY GENERAL ROBERTS Well, depending upon something that I'm going to argue in a minute, in this particular case, we're contending that this is not even a Martinez-Fuerte checkpoint. But if it is, then we're contending that once the reason for the checkpoint was satisfied, that any further referral to secondary inspection and even further questioning requires reasonable suspicion. MS. MOTT GOTTLIEB What is your authority for that? ATTORNEY GENERAL ROBERTS The authority for that is a combination in the cases of ---- MS. MOTT GOTTLIEB First of all, before you get the authority, which I do want to hear, what is your reason for it? I mean, what's the rationale? And then what's the authority supporting that? I mean, why do you think they needed ---- ATTORNEY GENERAL ROBERTS Because unlike what the majority opinions have held in Barnett, Kosnevis, and Soyland, Whitaker, this is a situation in which the reason for the initial stop, i.e., immigration check, had already been satisfied and ---- MS. MOTT GOTTLIEB You say it's immigration check, but if it is a border checkpoint, and I realize you're disputing that, but if it is a border checkpoint, there are two things they check at the border, as you know. As we all know, they check immigration status, and they also check for contraband, which includes not only drugs, it could include people as contraband, but it also could include gray market goods or, you know, there's a whole variety of things, you know, booze, all sorts of things they're not allowed to bring in the country without declaring or without paying import duties. So if this is a border checkpoint, it's not limited to checking immigration papers. ATTORNEY GENERAL ROBERTS Your Honor, I hope I did not misspeak. I've never conceded that this is a border checkpoint. No, I understand. You have an argument that it's not a border checkpoint, and we want to hear that argument. But you said even if it is, is your entire House of Cards premise on this not being a border checkpoint? If it is a border checkpoint, do all the other arguments collapse? ATTORNEY GENERAL ROBERTS First of all, this is neither a border checkpoint nor a functional equivalent of border checkpoint. This is an immigration checkpoint, which is removed from the border. I've never heard of an immigration checkpoint. That's what the language and the application was of the checkpoint in Martinez-Fuente, Hernandez, Soto Camacho, White, Barnett. All those cases were not border checkpoints.  I believe that the San Clemente checkpoint is something like 70 miles inside the border. I'm more aware of the San Clemente checkpoint, but I've never understood that it's limited to checking for immigrants. Even if you limit it to that, how do they know? This car claims to have come across the border. It doesn't show up on the database. It has evidence that it may have been modified by being painted. It has evidence that it may have gone through the brush. How do they know that it hasn't got aliens in the back and a trunk somewhere? ATTORNEY GENERAL ROBERTS Well, they don't know that except they can look inside, which is exactly what they did. It's a Dodge Caravan. There's no evidence that the windows were tinted and they couldn't look inside. They had the driver's window down. She had already shown evidence of her legality in the United States immediately upon being approached. And what do they do? The first question they ask her is, is your speedometer broken, which is directly related to the agent's testimony concerning indicia of smuggling narcotics. But they testified she came at an unusually high speed. Well, he also testified that within 100 yards the speed limit goes down from 65 to 15 and that she was probably going 25 or 30 when they said that she was going at an extremely high rate of speed given the 15 mile an hour speed limit. But this is not a checkpoint like the ones that we've been talking about where a mile ahead of time there's a warning, police checkpoint. Three quarters of a mile later, another warning, flashing lights, things that are intended to warn people as to what they're going to expect. I'm not sure what that goes to. Are you arguing that that invalidates the premise of the speedometer question? The premise of the speedometer question, Your Honor, was strictly related to wanting to get information about the driver. I understand that's what ultimately the officer testified to. But you think he – I'd assume you were now arguing why she might have been speeding shortly before coming to a stop. All that I'm suggesting is – This could be another rational explanation for – but you say there's no advance warning. So I wasn't sure where your line of response was coming from. Well, due to the nature of the checkpoint, there's not much warning, which is one of the arguments that I was going to make, was that this checkpoint is more akin to the Maxwell, although not as extreme. But getting back to the argument, what legitimate immigration purpose is served by asking someone if their speedometer is broken? Okay, I get your point on that. But can we come back to the construct that you're arguing for? You're saying that under these circumstances, there's no authority absent some kind of particular suspicion to send her over to the secondary checkpoint. What's your authority for that? Yes, Your Honor. And what I'm saying is that this is the flip side of what this Court has said on Barnett, Kushnevis, and Soyland, where reasonable suspicion was argued because there was an argument that was a drug search. And this Court said, and I believe it was Soyland, the judicial process requires us to abstain from entering into conjectural fact-finding when there was just a suggestion that the referral to secondary was a pretext for a drug search. The case holds that in the absence of objective evidence of pretext, they can be referred without reasonable suspicion. Well, then, inferentially, you have to conclude from that that when we have a case where clearly the referral to secondary is clearly based upon a drug search, there's no more argument. I guess I'm not sure I follow. Where in the cases do you see a requirement that this be limited to immigration? I mean, which case do you rely on most specifically? One moment, Your Honor. In the Kushnevis case, where they're talking about the fact that Martinez-Fuerte dealt only with immigration-related stops and didn't address the legality of investigating for drugs in immigration stops, they say that they will not inquire into the agent's subjective purpose in referring the card of secondary without objective evidence supporting a charge of pretext. In this case, we don't have any question. I'm sorry. You just mumbled something, but I have no idea. Where does it say that this has to be limited to immigration? I mean, Martinez-Fuerte. I'm looking at Martinez-Fuerte. There's nothing like that in Martinez-Fuerte that I can see. Nothing in Martinez-Fuerte suggesting that it's strictly an immigration stop? You know, the word is holding. Excuse me? The word is holding. Holding. You know what a holding is? Holding that this is limited to immigration stops. Yes, Your Honor. Any case that holds that? I find it surprising. Kushnevis indicates that Martinez-Fuerte was limited to immigration. I can read Martinez-Fuerte as well as anybody. I don't see it there. It was not a ruling. It was not a holding. I mean, there's a description of the case dealing with immigrants, and they do mention immigrants, but I don't see any requirement that the stop be limited to immigrants. What is it that prevents the government from saying, look, you're a truck, let's say, with Mexican license plates, we're going to stop you at San Onofre or San Clemente, pull you over and check and make sure you don't have any, I mean, let's say it's a big 18-wheeler, we're going to check and make sure that there isn't any goods for which the duty had to be paid that wasn't paid. I don't know what. Now, as a practical matter, what happens is that trucks are not often stopped because they always have to go to the border, and it's very hard to run a big truck through the brush. They tend to just come across the border, so they get checked at that point. But I don't know of any requirement that this be limited to immigration. In any event, you've exceeded your time. Maybe you can leave me for a bottle or two. Maybe you can think about an answer to that question. We'll hear from the government. Good morning. May it please the Court, Celeste Corlett, Assistant United States Attorney, here on behalf of the United States. In this case, the district court properly found that this checkpoint was lawful and that the agent's referral to secondary was lawful, even if the standard were reasonable suspicion. But we are arguing that the standard for referral in a drug case, it appears that the case law supports that it would be minimal suspicion. Do you, to follow up, just so I can understand what the government is, on the counsel's apparent position, he reads our cases, suggesting or saying or holding that if there is objective evidence that the referral to secondary is for purposes of a drug search, then there could be a Fourth Amendment violation absent reasonable or some level of articulated suspicion. Do you agree with that analysis of our cases? I think it goes even further in his position that at this type of checkpoint, all you can check is immigration. Could I just get an answer to my question? Because I'd like to know if we don't make it dependent on whether it's an immigration checkpoint, whether our case laws would say that referral to secondary requires articulable suspicion if there is objective evidence that the purpose for it is beyond immigration checking and is for purposes of a drug search. As I said, it appears that if there is articulable suspicion of drug smuggling, that then the agents are permitted to refer them to secondary for further investigation. And that's under United States v. Taylor. Okay. But then you're assuming that you have to come up with articulable suspicion. Is that correct? If it was solely for drug purposes. If it were. If there is objective evidence that that was the sole purpose here, then you would agree there would have to be articulable suspicion of a drug? Yes, Your Honor. Okay. Thank you. Now you can go on to Judge Flanagan. But as I understand counsel's position is that you cannot search beyond immigration status. Is there any case authority for that? That you cannot search beyond immigration status? At a checkpoint. No, Your Honor. I believe that all of the cases following Martinez-Fuerte supported that they could, as long as the sole purpose or the primary purpose, I'm sorry, as long as the primary purpose was for immigration violations, that the agents could also investigate into drug smuggling, as long as it didn't exceed the scope of the search. And under immigration violations, looking for immigration violations, they're allowed to briefly detain the individual and to make a visible search of the vehicle. And that's exactly what they did in this case. They asked her questions or she provided information regarding her immigration status, and they made a visual search of the vehicle. And as they briefly looked around the vehicle, saw several factors, I believe it was approximately five different items that provided to them reasonable suspicion and at least minimal suspicion that there was some sort of violation. And we are not conceding that this was solely for drug purposes. The record supports that the agents believed it could be either alien or drug smuggling throughout their testimony. They indicated that the purpose of their stop, or I'm sorry, the purpose of the immigration checkpoint was for both drugs and immigration violations, that their training, they learned different methods that people can smuggle both aliens and drugs. And they even specifically said that they knew that compartments could be built in a vehicle to hide both people and drugs. And it was based on all of their observations that supported that this individual may have been smuggling aliens or drugs that they referred her to Secretary. There didn't seem to be any indication that the car was heavy loaded or anything else that would indicate additional people. They did seem to have reasonable suspicion of drugs. She handed over her immigration papers. That was satisfied. So it seems to me factually here, the secondary referral had to be suspicion of drugs. Well, Your Honor, I believe that it easily, they satisfied the reasonable suspicion that there were drugs. But I believe that the record also supports that they thought that there was alien smuggling. Now, what evidence do you have of that? As I said, in the excerpt of record on page 53, they indicated that they had instances of where people hid. Yeah, they had instances, yes. But here, was there any indication or any suspicion that there were smuggling people? The agents actually, when they testified, they said that they believed that she was smuggling stuff. That was on the excerpt of record 37 to 38. They didn't specifically say drugs or aliens. But you would expect when they say stuff, they're talking about human beings? Well, I believe that they were talking about both, because they had testified that that's what they had been trained for, that the evidence of that was. Well, the speedometer testimony I also seem to go toward dashboard concealment. Is it conceivable you could stash stuff in the form of a human behind a dashboard? Actually, Your Honor, yes. Tragically, there have been examples of individuals who were put in a dashboard. And as I said on the- In the area of the speedometer? How does that work? Right, that they remove the dashboard, and they create a compartment between the dashboard and the firewall, and they are able to put an individual in there. And there's a specific tragic incident of a person being in there, and the agents recognized that when the person went to get out the registration from the car, the glove compartment, that they saw a hand inside the glove compartment and led them to believe that there was. But even if this was solely for drugs, it appears that the standard is minimal suspicion, which they easily had. And they also had reasonable suspicion that there was drugs in it. They were justified in referring her to secondary to follow up on that investigation. Where is the authority for minimal suspicion? That would be in United States v. Taylor. And in that case, they had both a suspicion of drugs and aliens. And the court indicated that, and this is on page 221 of United States v. Taylor, that brief detention was predicated on an articulable suspicion or a minimal suspicion of showing. And this court found that that was proper. And, Your Honor, as to the checkpoint being proper, this met all the requirements in Martinez-Fuerte. The primary purpose was to stop illegal immigration. It involved a minimal intrusion. The line agents exercised no discretion over where it was or what the hours were, and they were only able to stop cars that came through a checkpoint. Additionally, the visibility and presence of the checkpoint was clear that it was officially authorized. The defense counsel in his brief claimed that because the structure there, the trailer, was not permanent, that that supported that it was a roving as opposed to a permanent checkpoint. However, this court in United States v. Hernandez has indicated that it's not the permanency of the building, but rather the routine nature of the stop and the absence of officer discretion that is key. And that is exactly what they had in this case, and all the factors support that this checkpoint was lawful. And as I indicated, the factors that they had to refer this defendant to secondary was that this was a checkpoint only 22 miles north of the border of Mexico. It was surrounded by a national park area. The only road from the checkpoint, I'm sorry, from the border, the Lukeville Port of Entry, to the checkpoint was the road that the checkpoint was on. However, they had experience and training that people often circumvented that port of entry through the desert and came up onto that main road where the checkpoint was to continue on north into the United States. And everything about that car supported that that's what this individual may have done. The car was especially dusty. They testified it wasn't the usual dust that you would see in the desert, but especially dusty. There were attempts to wipe down the vehicle to try to hide that it had been especially dusty. There was desert brush in the vehicle. There was evidence of a compartment in the vehicle. The panel was not working, the speedometer was not working, and they had evidence that the vehicle had been recently painted, which they knew from their training and experience that they built compartments, and then they repaint the vehicle to hide that, and they had evidence that it had recently been painted. They also had evidence of attempt to mask the scent. And in this case, they did say of drugs. They did not say both of people and drugs, but they had evidence to mask the scent, and that was the air fresheners. When the agent testified when he went to the window, he smelled the air fresheners. And based on the totality of these circumstances, the agents had minimal suspicion, at least and even reasonable suspicion to refer her to secondary and to further their investigation. Thank you. Thank you, Your Honor. Let me take a minute for rebuttal if you wish to go over your time. If you have a minute. Just to be brief, Your Honor, I wanted to propose one more time that I don't believe that this checkpoint is a Martinez-Fuente type of a checkpoint anyway, but in the event that it is. I've heard all of the things that the government counsel enumerated as to why it is or should be. What's your counterargument? This particular checkpoint, it's on a state route, very similar to the state route in the Maxwell case. There's nothing there but a travel trailer, which is defined as a 16-foot travel trailer that can be pulled by any vehicle that has a hitch on it. There's no equipment there. There's a border patrolman who stands in the middle of the roadway. There's a sign about 100 yards down the road to slow down. You make it all sound suspicious, but none of those things seem particularly persuasive. There's testimony that there may not have been a palace, but it was operated every day at set hours, pursuant to set rules. There was very little office of discretion. Every car got stopped if it came to a particular hour. I don't see where any of the things you mentioned are particularly responsive. They don't have to erect a huge structure, and certainly the fact that the road is deserted doesn't mean that the government can't put a checkpoint there. Otherwise, you'd be inviting smuggling through that road. It's not as bad as Maxwell, to the extreme, as Maxwell, but it's not anything like the checkpoints that were approved in all the other cases, at San Clemente, Hacumba. I mean, the only difference between this and San Clemente is that the one in San Clemente is bigger. It's set on an interstate highway, and it's made of concrete rather than being a trailer. I don't know. I've gone to San Clemente frequently when that checkpoint wasn't operating. You just drive right past. But I guess they have hours or rules pursuant to which they operate. I don't see why this is any different. Well, Your Honor, it's not as bad as Maxwell, I concede, but it's not what the other ones are. I wanted to hit one more point briefly, if I have any time at all, and that's regarding the facts. When Officer Schaefer was questioned, every question that he was asked at the motion to suppress was directly related to drug interdiction. The excerpt of record beginning on pages 31 and 32 talk about, have you been trained in drug detection and what do these drug smugglers do? And then when he testified at the end about his inspection of the back of the vehicle, he indicated that the Dodge Caravans that gave him part of his reasonable suspicion, supposedly, that where he had located the drugs was in the tailgate compartment, and he showed Agent Harrow where the drugs should be, and they didn't find any. And they had completely searched the vehicle for drugs during that search. So I just wanted to point out that this is not a hybrid question about immigration and drugs. Once the lady showed – I think we understand the argument. Thank you. The case is argued in front of some members.
judges: B. Fletcher, Kozinski, Fisher